**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| JOSHUA PAUL ENGLISH and LAURA LEAH KING, as Surviving Parents of Adam Paul English, Deceased, and MIKE HINTON, as Administrator of the Estate of Adam Paul English, | |
| Plaintiffs, | Civil Action No. |
| v. | 2:20-CV-147-RWS |
| THE CITY OF GAINESVILLE, OFFICER JONATHAN FOWLER, and OFFICER JOSE HERNANDEZ, | |
| Defendants. | |

## <u>ORDER</u>

This case comes before the Court on Defendant Officer Jonathan Fowler's

("Officer Fowler" or "Defendant Fowler") Motion for Summary Judgment [Dkt.

67], Defendants the City of Gainesville ("the City" or "Gainesville") and Officer

Jose Hernandez's ("Officer Hernandez" or "Defendant Hernandez") Motion for

Summary Judgment and Motion to Exclude Opinions of Plaintiffs' Expert William

Harmening [Dkt. 68, 71], and Officer Fowler's Motion to Adopt Co-Defendants'

Motion to Exclude [Dkt. 74]. As a preliminary matter, Officer Fowler's Motion to

Adopt [Dkt. 74] is unopposed, so the Court will grant that Motion. After

reviewing the parties' briefings on the remaining Motions, the Court enters the

following Order.

## BACKGROUND

**I.    Factual Background**

This case stems from the shooting of a civilian by police officers in

September 2019.

On Friday, September 20, 2019, a medical assistant at the Northeast Georgia

Surgical Associates office located at 1075 Jesse Jewell Parkway in Gainesville,

Georgia was sitting at her desk when she thought she heard a gunshot outside.

She looked out her window and saw a man alternately pointing a gun at himself

and at the cars passing by on Jesse Jewell Parkway. Her boss advised the office

staff to lock the doors, and someone in the office called 911.

At approximately 4:30pm, police officers for the City of Gainesville

received a 911 dispatch about a suspicious male near 1075 Jesse Jewell Parkway

who was walking down the street and allegedly brandishing a firearm,

alternatively pointing it at himself and at traffic. The dispatch stated that a third

party thought they heard a gunshot,[1] that the nearby doctor's office was locked down, and that a hospital security guard was standing behind a tree with a gun pointed at the male.

Several police officers, including Jonathan Fowler and Jose Hernandez, responded to the scene, activating their lights and siren while they did so. Officer Fowler first spotted Adam Paul English standing in the median outside a doctor's office, where he was adjacent to Jesse Jewell Parkway, across the street from the hospital, and with a parking deck behind him. He testified that he initially saw Mr. English bent over at the waist with his right hand in a bag on the ground. Officer Hernandez, on the other hand, said that he saw Mr. English holding a bag. Neither officer saw Mr. English holding a gun or otherwise saw a gun on his person.

Both Officers Fowler and Hernandez exited their vehicles and drew their guns. Officer Fowler had a shotgun and Officer Hernandez had a handgun. Officer Fowler activated his body camera, as did another officer. Officer Hernandez's dash camera also recorded the encounter. Both officers began to approach Mr. English while shouting commands at him to raise his hands, show

---

[1] The officers testified that they heard dispatch state that the gunman had discharged a round from his gun and then reloaded the gun.

them his hands, and put his hands in the air.  The officers also intermittently warned Mr. English that they might shoot him.  At some point during their approach, the 911 dispatcher communicated that Mr. English had put the gun into a bag.  Officer Hernandez heard this communication, but Officer Fowler testified that he did not because he was simultaneously shouting commands at Mr. English. As the officers approached, Mr. English stopped and put the bag on the ground. Instead of raising his hands or taking any other action, Mr. English stood still, with his thumbs in his pockets, and stared and "smirked" at the officers.  The officers stated that Mr. English kept his right side turned slightly away from them in what they called a "bladed" position.  One of the other officers asked whether anyone had a less lethal weapon like a Taser.

After a very short time in this standoff, just seconds into the start of the bodycam videos and less than 20 seconds after Officer Hernandez began yelling commands, Officers Fowler and Hernandez testified that they saw Mr. English make a quick movement with the right side of his body as if to reach towards the bag at his feet (and the gun in that bag) or a hidden firearm in his waistband on the far side of his body.[2]  The officers' bodycam video does not necessarily make

---

[2] The officer and witness testimony regarding their recollection of Mr. English's movement varies.  Indeed, Officer Hernandez testified that he saw Mr. English quickly move his right arm and hand away from them, while Officer Fowler

clear what happened, as the events proceeded in a matter of seconds. In any event,

Officers Fowler and Hernandez testified that they perceived Mr. English's alleged

movement to be an act of "active resistance" and an "imminent threat."

Accordingly, as a result of his movement, Officer Fowler fired one shot and

Officer Hernandez fired eight shots. Officer Fowler's shot hit Mr. English in the

back, and two of Officer Hernandez's shots hit Mr. English in the upper leg and

base of his neck. Mr. English died in the shooting. The officers subsequently

found the gun in the bag at Mr. English's feet, not in his hand or on his person.

## II.    Procedural History

Plaintiffs—Mr. English's parents, Joshua Paul English and Laura Leah

King, and the administrator of his estate, Mike Hinton—filed their second

amended complaint on June 14, 2021 [Dkt. 58], and it is the operative complaint

here. This complaint asserts the following claims: a Fourth Amendment excessive

force claim under § 1983 (Count I against Defendants Fowler and Hernandez in

their individual capacities); a state law battery claim (Count II against Defendants

Gainesville, Fowler, and Hernandez, the latter two in their individual capacities); a

state law negligence claim (Count III against Defendants Gainesville, Fowler, and

---

testified both that Mr. English made a quick movement toward the officers with his
right shoulder and hand and that he made a quick movement away from the
officers as if reaching his hand toward the hidden side of his waistband.

Hernandez, the latter two in their individual capacities); and a state law negligent hiring and retention claim (Count IV against Defendant Gainesville).

Defendant Fowler filed a Motion for Summary Judgment on September 21, 2021 [Dkt. 67].  Separately, Defendants Hernandez and Gainesville filed a Motion for Summary Judgment [Dkt. 68], and they later filed a Motion to Exclude the Opinions of Plaintiffs' Expert William Harmening [Dkt. 71].  Defendant Fowler moved to adopt the other Defendants' Motion to Exclude [Dkt. 74].  Plaintiffs opposed both Motions for Summary Judgment [Dkt. 77] as well as the Motion to Exclude [Dkt. 78].  Defendants filed replies in support of their Motions [Dkt. 81, 82, 83].

## DISCUSSION

## I.    Legal Standard

The standard for summary judgment is well-established.  Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the case under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. at 249–50.

In resolving a motion for summary judgment, the court will "consider the record and draw all reasonable inferences in the light most favorable to the non-moving party." Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018).  But the court is bound only to draw those inferences which are reasonable.  "Where the records taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477

U.S. at 249–50 (citations omitted); <u>see also</u> <u>Matsushita</u>, 475 U.S. at 586 (once the

moving party has met its burden under Rule 56(a), the non-moving party "must do

more than simply show there is some metaphysical doubt as to the material facts").

## II.    Federal Law Claim

Defendants Fowler and Hernandez move for summary judgment as to

Plaintiffs' Fourth Amendment excessive force claim, arguing that they are entitled

to qualified immunity for this claim.  [Dkt. 67-2 – Def. Fowler's MSJ Br., at 12-

22; Dkt. 68-1 – Def. Hernandez's MSJ Br., at 4-15].  Plaintiffs oppose their

motions, arguing that a jury could find that Defendants Fowler and Hernandez

unreasonably used deadly force in violation of clearly established law under the

Fourth Amendment.  [Dkt. 77 – Pls.' Opp. Br., at 6-15].

### A. Qualified Immunity Standard

The doctrine of qualified immunity "protects government officials who are

sued under § 1983 for money damages in their individual capacities."  <u>Hardigree v.</u>

<u>Lofton</u>, 992 F.3d 1216, 1223 (11th Cir. 2021).  It "aims to strike a balance between

the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and

liability when they perform their duties reasonably."  <u>Walters v. Freeman</u>, 572 F.

App'x. 723, 726 (11th Cir. 2014) (citation and quotations omitted).  Accordingly, qualified immunity protects government officials who are engaged in discretionary functions and sued in their individual capacities unless they "violate clearly established federal statutory or constitutional rights of which a reasonable person would have known." Id. (citation, punctuation, and quotations omitted).

Courts use a two-step inquiry to decide whether qualified immunity should be granted.  First, the party invoking the protection of qualified immunity "must establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." Hardigree, 992 F.3d at 1223 (citation and quotations omitted).  If so, the court must determine "whether the facts, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right that was clearly established at that time." Id. at 1223-24 (citation and quotations omitted).

A right is "clearly established" if "the state of the law on the date of the alleged misconduct placed defendants on fair warning that their alleged treatment of the plaintiff was unconstitutional." Id. at 1224 (citation and quotations omitted). More specifically, rights may be clearly established for qualified immunity purposes by three methods: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the

Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Crocker v. Beatty, 886 F.3d 1132, 1137 (11th Cir. 2018) (citation and quotations omitted). "In all three methods, the salient question is whether the state of the law at the time of the incident gave the officer fair warning that his conduct was unlawful." Powell v. Snook, 2022 WL 363887, at *5 (11th Cir. Feb. 8, 2022) (citation, punctuation, and quotations omitted).

## B. Fourth Amendment Excessive Force Standard

"The Fourth Amendment affords individuals the right to be secure in their persons against unreasonable seizures." Scott v. Roundtree, 2021 WL 6009752, at *4 (S.D. Ga. Dec. 20, 2021) (citing U.S. Const. amend. IV.). "This Amendment encompasses the right to be free from excessive force during the course of a criminal apprehension." Id. (citation and quotations omitted). "In excessive force cases, whether a plaintiff's constitutional rights were violated is governed by the Fourth Amendment's objective reasonableness standard," under which the officer's use of force is judged "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Johnson v. City of Miami Beach, 18 F.4th 1267, 1272 (11th Cir. 2021) (citations and quotations omitted).

For a plaintiff to establish a Fourth Amendment excessive force claim, he or she "must allege (1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable." Roundtree, 2021 WL 6009752, at *4 (citation and quotations omitted). The reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). More specifically, a court must "evaluate the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, whether the suspect is actively resisting or attempting to flee, the need for the application of force, the extent of the injury inflicted, and whether the force used was reasonably proportionate to the need for the force." Crenshaw v. Lister, 556 F.3d 1283, 1288 (11th Cir. 2009).

Finally, "[w]hen an officer uses deadly force, [the Court] must also consider whether the officer

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some

> warning about the possible use of deadly force, if
> feasible.[3]

Bradley v. Benton, 10 F.4th 1232, 1240-41 (11th Cir. 2021) (citation and

quotations omitted).

### C. Lawfulness of Defendants Fowler and Hernandez's Use of Force on Mr. English

As a threshold matter, the Court concludes that Defendants Fowler and

Hernandez were acting pursuant to their discretionary authority when the events at

issue occurred. See, e.g., Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir.

2004) (officer's use of deadly force in altercation with defendant was clearly

within the scope of his discretionary authority). In addition, there is no question

that they seized Mr. English when they shot him. Hunter v. City of Leeds, 941

F.3d 1265, 1278-79 (11th Cir. 2019) ("The use of deadly force by the police is a

seizure subject to the Fourth Amendment's requirement of reasonableness.")

(citation omitted). Accordingly, whether Defendants Fowler and Hernandez are

entitled to qualified immunity depends on whether their conduct violated Mr.

English's Fourth Amendment right to be free from the use of excessive force and,

if so, whether that right was clearly established.

---

[3] Courts in this circuit often refer to these factors as the Garner factors, as they
were first set out in the Supreme Court's decision in Tennessee v. Garner, 471 U.S.
1, 11-12 (1985). For purposes of consistency, this Court will do the same here.

12

### 1.  Whether Defendants' Use of Force Was Reasonable

Defendants Fowler and Hernandez argue that their use of force on Mr. English was reasonable (and therefore not excessive) because they encountered a suspect who had brandished a loaded gun, pointed it at himself and passing motorists, discharged the gun at least once and reloaded it, ignored and disobeyed their commands, and refused to show his hands.  [Dkt. 67-2 – Def. Fowler's MSJ Br., at 18-19; Dkt. 68-1 – Def. Hernandez's MSJ Br., at 8-9].  In addition, Defendants contend that they did not know that Mr. English had put his gun in the bag at his feet, and instead thought that the gun might be concealed on his waistband or under his shirt.  [Id.].  Given these facts, when Defendants saw Mr. English "ma[k]e a move . . . as if he was reaching for a possible weapon," they argue that they had actual (and arguable) probable cause to use deadly force on him.  [Id.].  In contrast, Plaintiffs argue that Defendants Fowler and Hernandez's use of force on Mr. English was unreasonable and excessive because, at the time he was shot, Mr. English was "neither brandishing a weapon nor using it in a threatening manner."  [Dkt. 77 – Pls.' Opp. Br., at 9].

Here, under the totality of the circumstances and viewing the evidence and the videos in the light most favorable to Plaintiffs, a reasonable jury could find that

Defendants Fowler and Hernandez's use of force was not reasonable and was therefore unconstitutional.

As to the first <u>Garner</u> factor, it is not clear that the officers had probable cause to believe that Mr. English posed a threat of serious physical harm to themselves or others or that he had committed a crime involving the infliction or threatened infliction of serious physical harm.  While it is true that dispatch told the officers that Mr. English had recently fired his gun and intermittently pointed it at himself and at passing motorists, by no means a minor crime, those events occurred before the officers arrived at the scene and caused no injuries.  When the officers arrived and exited their cars, they did not see Mr. English holding a gun at all.  Instead, he simply stood still, with his thumbs hooked in the pockets of his pants, apparently ignoring the officers' commands.  And, though the officers say that they saw him make a quick motion as if to reach for a gun in his waistband, the videos leave that conclusion up for interpretation (and could certainly tell a different story in the eyes of a reasonable jury).  Indeed, the videos show Mr. English make the slightest, almost imperceptible movement just moments before he is shot.  These facts, construed most favorably to Mr. English, would allow a reasonable jury to find that Defendants Fowler and Hernandez did not have

probable cause to believe that Mr. English posed a risk of serious physical harm to themselves or anyone else.

The second <u>Garner</u> factor—the need to prevent escape—more clearly weighs in Plaintiffs' favor. As mentioned, when the officers first encountered Mr. English, he was standing stationary on the sidewalk. He did not appear to have access to a nearby car, compared to the multiple police vehicles that the officers had mere feet away in case they needed to engage in a chase. More importantly, though, Mr. English made no efforts to flee the scene. Instead, he simply ignored the officers and disregarded their orders to raise and show them his hands. A reasonable jury could find that the officers did not need to use deadly force to prevent Mr. English's escape. The third <u>Garner</u> factor—warning of the intent to use deadly force—is not in dispute, as the officers yelled multiple times that they would shoot Mr. English if he did not comply with their commands.

For these reasons, the Court finds that a reasonable jury could accept Plaintiffs' version of the facts and find that Defendants Fowler and Hernandez violated Mr. English's Fourth Amendment right to be free from excessive force when they shot him. Of course, a jury could instead credit Defendants Fowler and Hernandez's testimony and find that their use of deadly force was appropriate. Given the circumstances and the split-second decision they had to make, and the

15

fact that the judicial system does not necessarily require officers to "wait and hope for the best" in all situations, Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) (punctuation and quotations omitted), a jury could conclude that Plaintiffs cannot carry their burden of proving that the force used was not reasonably proportionate to the amount of force needed. But the Court cannot reach that conclusion as a matter of law at this stage of the proceedings. In short, the relevant facts and the conclusions to be drawn from those facts are disputed.

### 2. Whether The Law Was Clearly Established at The Time of The Incident

The Court now turns to the question of whether Mr. English's federal constitutional right to be free from the use of excessive force in these circumstances was clearly established at the time of Defendants Fowler and Hernandez's conduct. Defendants Fowler and Hernandez contend that it was not. In particular, Defendant Fowler argues that "[t]here is no controlling case law in this Circuit that would put [him] on notice that his use of deadly force in this circumstance was unconstitutional," focusing on cases holding that officers constitutionally used lethal force on suspects who had not yet drawn their guns but had them "available for ready use." [Dkt. 67-2 – Def. Fowler's MSJ Br., at 20-22]. Similarly, Defendant Hernandez argues that Plaintiffs have not (and cannot) point to any cases that "show that every reasonable officer would inevitably have held

16

fire in the face of a noncompliant gunman who refused to reveal his hands and had recently discharged his weapon and pointed it at innocent bystanders." [Dkt. 68-1 – Def. Hernandez's MSJ Br., at 11-15].

On the other hand, Plaintiffs focus not on any factually identical precedent, but rather on a broad statement of principle that they contend has been established and solidified in a long line of Eleventh Circuit cases. In so doing, they point to several cases which they argue collectively and clearly show that "where the suspect is not a fleeing felon and poses no immediate threat to the officer or others," the "mere possession of a firearm—whether it is in the suspect's hands, on the car seat next to him, or in a bag on the ground by his feet—is not itself justification for the use of deadly force." [Dkt. 77 – Pls.' Opp. Br., at 9-15]. Put another way, Plaintiffs posit that "[t]he particularized rule that emerges from all these cases is that it is a Fourth Amendment violation to shoot someone who is merely in possession of a gun but not brandishing it in a threatening manner." [Id. at 12].

As discussed, a plaintiff can demonstrate that a constitutional right was clearly established by "point[ing] to a materially similar case that has already been decided, giving notice to the police" that their conduct was unlawful; demonstrating "that a broader, clearly established principle should control the

novel facts in this situation"; or, "in exceptionally rare cases, . . . show[ing] that the defendant's conduct so obviously violated the constitution that prior case law is unnecessary." Bohanan v. Paulding Cnty., Ga., 479 F. Supp. 3d 1345, 1360-61 (N.D. Ga. 2020) (citation, punctuation, and quotations omitted). "While officials must have fair warning that their acts are unconstitutional, there need not be a case 'on all fours,' with materially identical facts, before [courts] will allow suits against them." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004). Instead, "[a] principle of constitutional law can be clearly established even if there are notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." Id. (citations and quotations omitted).

Here, as Defendants Fowler and Hernandez note, Plaintiffs have not pointed to any prior, binding decisions with materially identical facts. Nor has this Court found any. However, the Court finds that the unlawfulness of Defendants Fowler and Hernandez's conduct—in using lethal force against an unarmed, non-resistant, non-threatening suspect who was not attempting to flee—was clearly established in September of 2019.

By 2013, the Eleventh Circuit had recognized that "the use of deadly force against a non-resisting suspect who posed no danger violates a suspect's Fourth Amendment right to be free from excessive force."  Morton v. Kirkwood, 707 F.3d 1276, 1283 (11th Cir. 2013); see also Perez v. Suszczynski, 809 F.3d 1213, 1222 (11th Cir. 2016) ("Our case law clearly establishes that the use of force against an arrestee who . . . is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive.") (citations omitted).  And, by 2008, "the Eleventh Circuit had held in plain terms that it is unconstitutionally excessive for officials to use substantial force against a person 'who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated.'"  Bohanan, 479 F. Supp. 3d at 1361 (quoting Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008) (citation omitted)). Further, the Perez Court in 2016 held that "deadly force is not justified where the suspect poses no immediate threat to the officer and no threat to others," and "a police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  809 F.3d at 1222 (citation, punctuation, and quotations omitted).

Defendants Fowler and Hernandez were thus both on fair notice at the time of the shooting that the use of deadly force has constitutional limits, and that their use of deadly force on Mr. English would be justified only if a reasonable officer

in their position would believe that Mr. English posed an *immediate* threat of

serious physical harm. Under Plaintiffs' version of the facts, these circumstances

did not exist: the video evidence showed that Mr. English was not fleeing the scene

or resisting arrest when the officers shot him; he was not threatening the officers,

himself, or anyone else; and the officers' testimony acknowledged that Mr. English

was unarmed, an admission also supported by the videos.

Defendants Fowler and Hernandez contest several of these points,

contending that they do not accurately depict the scene as they encountered it.

First, they point out that dispatch told them that Mr. English had previously

discharged a gun and pointed it at himself and passing motorists. True enough.

However, Mr. English's earlier commission of a crime, even a serious one, did not

necessarily justify the later use of deadly force when he was no longer exhibiting

threatening behavior. Second, the officers contend that Mr. English presumably

still possessed the gun, even though he was not holding it, they could not see it on

his person, and Officer Hernandez heard dispatch report that the gun was now in

the bag at Mr. English's feet. Regardless, "the mere presence of a gun or other

weapon is not enough to warrant the exercise of deadly force and shield an officer

from suit." Id. at 1220. Rather, "[w]here the weapon was, what type of weapon it

was, and what was happening with the weapon are all inquiries crucial to the

reasonableness determination." Id. (citations omitted).

Third, Defendants Fowler and Hernandez note that Mr. English refused to

comply with their orders to show them his hands.  While supported by the

videocam evidence, this fact is a bit misleading.  Indeed, mere seconds passed

between the officers' arrival on the scene and their shooting of Mr. English, so it

was not as if Mr. English defied orders for a significant period of time.

Regardless, ignoring police orders while standing still is obviously not the same as

actively resisting arrest (such as by fleeing the scene or physically fighting back in

some way).  Fourth, Defendants put a lot of weight on the abrupt movement they

claim they saw Mr. English make before they shot him, asserting that they found

the movement threatening since they thought he might be reaching for a gun

hidden in his waistband.  There are multiple video angles of the encounter, and Mr.

English's supposed movement is almost imperceptible.  The Court is cautious not

to second-guess Defendants Fowler and Hernandez's thought processes, but a

reasonable jury could view the sequence of events differently than they said they

did.

Finally, Defendants Fowler and Hernandez both point to an August 2019

Eleventh Circuit case, Davis v. Edwards, which they contend "clearly establishes"

21

that a police officer's use of force is not excessive when he or she shoots a suspect "who may be armed, had recently brandished and discharged a weapon in public, and who utterly refuses to obey commands to show his hands to the officers." [Dkt. 82 – Def. Hernandez's Reply Br., at 5, 7-8]. Though <u>Davis</u> has some surface-level similarities to the case at issue here, including reports that the suspect was armed and behaving erratically, it is readily distinguishable for several reasons. In <u>Davis</u>, the responding officer knew the suspect as someone who was mentally unbalanced who had a history of violence, including against family members and police officers. 779 F. App'x. 691, 693, 695-96 (11th Cir. 2019). The officer had personally witnessed the suspect commit acts of violence before. <u>Id.</u> at 693. The officers here had no such prior knowledge of or interactions with Mr. English. In addition, when the responding officer in <u>Davis</u> arrived at the scene, the suspect fled the scene and actively resisted police commands to stop. <u>Id.</u> at 693, 695. As mentioned here, Mr. English never attempted to flee or actively resist arrest; to the contrary, he simply stood there. Finally, when the suspect in <u>Davis</u> stopped fleeing, he reached towards his back waistband. <u>Id.</u> at 693, 695-96. It was only after this point that the officer shot him. <u>Id.</u> As this Court has stated, the video in this case does not make it at all clear what movement Mr. English was making before he was shot. Accordingly, though Defendants Fowler and

Hernandez would have the Court apply <u>Davis</u> as conclusive here, the Court finds that the cases are fundamentally different and that <u>Davis</u> is not determinative.

In sum, again under Plaintiffs' version of the facts, a reasonable officer in Defendants Fowler and Hernandez's positions should have known that the Fourth Amendment forbade him from using deadly force against Mr. English under these circumstances. In this case, a jury could conclude from Plaintiffs' evidence that Defendants Fowler and Martinez fatally shot an unarmed man who, despite earlier discharging his gun and pointing it at himself and passing motorists, was at the time that he encountered the officers simply standing still and ignoring their commands. The jury could further find that Mr. English's slight, almost imperceptible movement before he was shot was insufficiently threatening to warrant the use of deadly force against him. Under the authority discussed above, existing case law provided sufficient warning to alert Defendants Fowler and Hernandez that fatally shooting Mr. English, under these circumstances, would violate the latter's Fourth Amendment rights.

Accordingly, Defendants Fowler and Hernandez's Motions for Summary Judgment as to the Fourth Amendment excessive force claim against them are **DENIED**.

## III.    State Law Claims

Defendants Fowler and Hernandez move for summary judgment as to Plaintiffs' state law battery and negligence claims against them in their individual capacities, arguing that they are entitled to official immunity for these claims. [Dkt. 67-2 – Def. Fowler's MSJ Br., at 3, 12, 22-24; Dkt. 68-1 – Def. Hernandez's MSJ Br., at 15-17]. Defendant Hernandez also argues that the state law claims against him are barred by the doctrine of justification. [Dkt. 68-1 – Defs. Hernandez and City's MSJ Br., at 15-1]. In addition, Defendant Gainesville moves for summary judgment as to Plaintiffs' state law battery, negligence, and negligent hiring and retention claims, arguing that it is entitled to sovereign immunity and Plaintiffs have no evidence to support their claims against it. [Id. at 17-24]. Plaintiffs oppose these motions, arguing that a jury could find that Defendants Fowler and Hernandez committed a tort for which they do not have official immunity and the City waived its sovereign immunity for the officers' torts by purchasing liability insurance. [Dkt. 77 – Pls.' Opp. Br., at 15-25].

The Court will first analyze the individual defendants' arguments for summary judgment on the state law claims against them, and it will then turn to the City's arguments.

### A. Defendants Fowler and Hernandez's Official Immunity From State Law Battery and Negligence Claims

Defendants Fowler and Hernandez move for summary judgment on Plaintiffs' state law battery and negligence claims against them, contending that they are entitled to official immunity for both of these claims. Defendant Hernandez also contends that the state law claims against him are barred by the doctrine of justification. Plaintiffs disagree, arguing that a jury could find that both defendants committed a tort under Georgia law for which they do not have official immunity.

"Georgia's doctrine of official immunity—much like qualified immunity under federal law—offers public officers and employees limited protection from suit in their personal capacity." Bohanan, 479 F. Supp. 3d at 1364 (citation and quotations omitted). In particular, "public agents are immune from liability for their discretionary acts unless they are done with malice or intent to injure." Cantrell v. White, 178 F. Supp. 3d 1308, 1318 (N.D. Ga. 2016) (citation, punctuation, and quotations omitted). "A discretionary act [] calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Speight v. Griggs, 579 F. App'x. 757, 759 (11th Cir. 2014) (citation and quotations omitted).

"[A]ctual malice is a demanding standard [that] requires an officer to act with a deliberate intention to do a wrongful act." Cantrell, 178 F. Supp. 3d at 1318 (citations and quotations omitted); see also, e.g., Felio v. Hyatt, 639 F. App'x. 604, 611 (11th Cir. 2016) (the standard "asks whether the defendant had a wicked motive, or intended to cause harm to the plaintiff, rather than just intending to do the act that resulted in the plaintiff's injury") (citation omitted); Schwartz v. Gwinnett Cnty., Ga., 924 F. Supp. 2d 1362, 1378 (N.D. Ga. 2013) ("Actual malice does not include implied malice, or the reckless disregard for the rights and safety of others.") (citations and quotations omitted). "[T]he mere fact that a police officer's decisionmaking was misguided or even reckless is not enough to support a finding of actual malice." Bohanan, 479 F. Supp. 3d at 1365 (citation and punctuation omitted). "Similarly, Georgia's courts have interpreted the phrase 'actual intent to cause injury,' as used in the Georgia Constitution, to mean 'an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury.'" Id. (citation and quotations omitted).

"In the context of a shooting by a police officer, the Supreme Court of Georgia has held that if the officer shot intentionally and without justification, then he acted solely with the tortious actual intent to cause injury and would not be protected by official immunity." Cantrell, 178 F. Supp. 3d at 1318 (citation,

punctuation, and quotations omitted).  "If, however, the officer shot in self-defense, then he had no actual tortious intent to harm."  Id. (citation, punctuation, and quotations omitted).

Since Defendants Fowler and Hernandez's actions here were discretionary, they are entitled to official immunity unless Plaintiffs demonstrate that they acted with actual malice or an intent to injure.  According to Defendants Fowler and Hernandez, they shot Mr. English because they knew that Mr. English had recently discharged a weapon in public, pointed his gun at motorists, might still be armed, refused to show his hands, and made a move as if reaching for a weapon, such that he posed an immediate threat to themselves, the other officers, and passersby. [Dkt. 67-2 – Def. Fowler's MSJ Br., at 23-24; Dkt. 68-1 – Def. Hernandez's MSJ Br., at 17].  However, other evidence raises a factual question regarding whether Mr. English posed an imminent threat to the officers and, therefore, whether the officers acted with justification.  Indeed, the officers conceded that they did not see Mr. English holding a gun or otherwise identify a gun on his person before they shot him.  In addition, the videos submitted as evidence do not make definitively clear that Mr. English was in fact reaching for a weapon.  To the contrary, they show Mr. English standing still and then making a slight movement, almost imperceptible to the naked eye, before the officers shot him.

The evidence could lead a reasonable jury to conclude that Defendants Fowler and Hernandez lacked any justification to fire their guns at Mr. English in purported self-defense.  See Bohanan, 479 F. Supp. 3d at 1366.  And under Georgia law, if they shot Mr. English without such a justification, official immunity does not shield them from suit.  Viewed in the light most favorable to Plaintiffs, this factual dispute precludes a determination as a matter of law that Defendants Fowler and Hernandez are entitled to official immunity from Plaintiffs' state law battery and negligence claims.  See, e.g., Ivey v. Smart, 2014 WL 11460485, at *19 (N.D. Ga. Sept. 18, 2014) (denying summary judgment on official immunity grounds where a factual question existed as to whether officer shot suspect before or after he was face down on the ground); Porter v. Massarelli, 692 S.E.2d 722, 726 (Ga. Ct. App. 2010) (denying summary judgment where evidence was in dispute as to whether the officer shot suspect to protect himself).

Accordingly, Defendants Fowler and Hernandez's Motions for Summary Judgment as to Plaintiffs' state law battery and negligence claims against them are **DENIED**.

### B. Defendant Gainesville's Sovereign Immunity From State Law Battery, Negligence, and Negligent Hiring and Retention Claims

The City also moves for summary judgment on all of Plaintiffs' state law claims against it, contending that it is entitled to sovereign immunity for each of

these claims.  Plaintiffs dispute the City's position, believing that the City has waived its entitlement to sovereign immunity through its purchase of liability insurance.

"The doctrine of sovereign immunity, also known as governmental immunity, protects all levels of governments from legal action unless they have waived their immunity from suit."  Watts v. City of Dillard, 670 S.E.2d 442, 442 (Ga. Ct. App. 2008) (citation and quotations omitted).  The doctrine is enshrined in both the Georgia constitution and via statute.  See Ga. Const. of 1983, Art. IX, Sec. II., Par. IX; O.C.G.A. § 36-33-1(a) ("it is the public policy of the State of Georgia that there is no waiver of the sovereign immunity of municipal corporations of the state and such municipal corporations shall be immune from liability for damages").

Sovereign immunity "can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver."  Lee v. Christian, 221 F. Supp. 3d 1370, 1380 (S.D. Ga. 2016) (citation and quotations omitted).  The General Assembly has carved out an exception for the purchase of liability insurance.  Under this exception, "[a] municipal corporation shall not waive its immunity by the purchase of liability insurance . . . unless the policy of insurance issued covers an occurrence for which

the defense of sovereign immunity is available, and then only to the extent of the

limits of such insurance policy." O.C.G.A. § 36-33-1(a). "Any waiver of

sovereign immunity must be demonstrated by the party who seeks to benefit from

the waiver." Jenkins v. Lee, 2021 WL 3824673, at *3 (M.D. Ga. Aug. 26, 2021)

(citation omitted).

     Here, the City acknowledges that it has purchased liability insurance. [Dkt.

68-1 – Def. City's MSJ Br., at 19-20]. However, it points to a policy endorsement

entitled "Protection of Immunity" which it contends protects against the waiver of

its sovereign immunity. [Id.] Specifically, the endorsement provides:

> We have no duty to pay damages on any insured's behalf
> under this policy unless the defenses of sovereign and
> governmental immunity are inapplicable to such insured.
>
> [...]
>
> This policy and any coverages associated therewith does
> not constitute or reflect an intent by you or any other
> person or organization to waive or forego any defenses of
> sovereign and governmental immunity available to any
> insured, whether based upon statute(s), common law or
> otherwise, including Georgia Code Section 36-33-1, or
> any amendments.

[Id.]. The City therefore contends that because its "insurance policy expressly

provides that it will not cover occurrences when sovereign immunity would

otherwise apply," it "has not waived sovereign immunity by the purchase of

insurance covering [its officers'] actions." [Id. at 20]. In support of this position, the City cites Gatto v. City of Statesboro, 834 S.E.2d 623 (Ga. Ct. App. 2019), in which the Georgia Court of Appeals held that an identical policy endorsement precluded the waiver of its sovereign immunity. [Id. at 20-21].

Plaintiffs, for their part, are unconvinced by the Gatto Court's reasoning. [Dkt. 77 – Pls.' Opp. Br., at 24-25]. They concede that the City's interpretation of Gatto is correct in that it "allows insurers to contract around the waiver," but they contend that such an interpretation and application of the endorsement would result in a "sham contract" that would "perpetrate[] a fraud on taxpayers." [Id. at 20-22, 24]. Instead, Plaintiffs urge this Court to focus on Hiers v. City of Barwick, 414 S.E.2d 647 (Ga. 1992), which they contend supports their position.

In sum, the parties disagree over whether the City's liability insurance policy endorsement validly preserves its right to sovereign immunity. Since the parties briefed these issues, Georgia appellate courts have provided a clear answer to this question. In late October 2021, the Georgia Court of Appeals considered whether similar language in a liability insurance policy, in a provision labeled "Sovereign Immunity and Damages Caps" which stated that "issuance of this insurance shall not be deemed a waiver of any statutory immunities by or on behalf of any insured," meant that the City in fact did not waive its sovereign immunity. Sharma

v. City of Alpharetta, 865 S.E.2d 287, 289 (Ga. Ct. App. 2021). The Court found

that the language "preserve[d] the City's right to use the defense of sovereign

immunity wherever legally permitted" and "prevent[ed] the purchase of the policy

from expanding the City's liability in any way." Id. at 291. As a result, the Court

concluded that "there is no waiver of the City's sovereign immunity under this

contract." Id. (citation omitted).

Then, in a February 2022 opinion, the Georgia Supreme Court reached the

same conclusion and therefore resolved any lingering doubt on this issue. In

Atlantic Specialty Insurance Company v. City of College Park, 2022 WL 451879

(Ga. Feb. 15, 2022), a case that Plaintiffs noted was on appeal in their briefing, the

City had liability insurance policies with "Protection of Immunity" endorsements[4]

that included language identical to that at issue here. Id. at *1-2. In analyzing the

import and meaning of that language, the Court explicitly endorsed both Gatto and

Sharma. Id. at *7-8 ("The Court of Appeals would have reached the right result in

this case had it followed its analogous precedent [in Gatto and Sharma]."). In so

doing, the Court concluded that the City's liability insurance policy endorsement

---

[4] The policies in Atlantic Specialty applied to the motor vehicle context, compared
to the more general liability insurance policies found in Gatto, but the Court noted
that "there is no material difference in the controlling parts of the statutory
schemes or in the pertinent legal analysis." Id. at *8.

did not waive its sovereign immunity.  Id. at *6-8 ("the Immunity Endorsements do not contravene public policy.") (citations omitted).

This Court is bound by the Georgia Supreme Court's decision in Atlantic Specialty.  The Court thus finds that the City has not waived sovereign immunity by its purchase of liability insurance, and it therefore has sovereign immunity over Plaintiffs' state law battery, negligence, and negligent hiring and retention claims.

Accordingly, Defendant Gainesville's Motion for Summary Judgment as to Plaintiffs' state law claims against it is **GRANTED**, and the City is hereby dismissed from this case.

## IV.    Motion to Exclude Opinions of Plaintiffs' Expert, William Harmening

Finally, Defendants Gainesville and Hernandez move to exclude the opinions of Plaintiffs' expert witness, William Harmening [Dkt. 71].  They argue that his testimony should be excluded as unreliable and irrelevant, because he "simply dissects the body camera evidence on a frame-by-frame basis—a tactic expressly rejected by some federal courts—to make armchair criticisms of the life-and-death decisions Officers Hernandez and Fowler had to make in a split-second."  [Dkt. 71 – Def. Hernandez's Mot. to Exclude, at 1-2].  Plaintiffs oppose this motion, arguing that Defendants' argument fails but that, even if reliance on frame-by-frame evidence is impermissible, that was only one piece of evidence

Mr. Harmening considered and should not preclude his testimony altogether.

[Dkt. 78 – Pls.' Opp., at 1-3, 6-11].

Federal Rule of Evidence 702 governs the use of expert witnesses in federal court.  It provides that:

> A witness who is qualified as an expert by knowledge, sill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the Supreme Court has held, Rule 702 imposes a "gatekeeping" responsibility on each trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).  The requirement "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (punctuation omitted).  The judge's role "is especially significant since the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it." U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citation and quotations omitted).

Courts in the Eleventh Circuit carry out a rigorous three-part inquiry when fulfilling their duties under Rule 702 and Daubert.  Id. at 1260.  The judge must ask whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. (citation and quotations omitted).  The burden of proving these criteria lies with the proponent of the expert's testimony.  Id.

Defendants Gainesville and Hernandez move to exclude Mr. Harmening's opinions and testimony under the second prong of this Circuit's three-part test— whether the methodology by which Mr. Harmening reached his conclusions is the

product of reliable principles and methods.[5]  [Dkt. 71 – Defs. City and

Hernandez's Mot. to Exclude, at 7-12].  Specifically, they argue that his "opinions

regarding the appropriateness of the officers' use of force, which are based on his

frame-by-frame analysis of the body camera videos, should be excluded because

his method of dissecting screenshots of an incident does not comport with the well-

recognized standards for reviewing officers' split-second decisions in hindsight."

[Id. at 7].

　　　The Court disagrees and will not exclude Mr. Harmening's opinions and

testimony wholesale, as it finds that Mr. Harmening's methodology is the product

of reliable principles and methods.  It is true that, as part of his analysis, Mr.

Harmening reviewed sequential still shots or frames of the fatal encounter between

Mr. English and the officers.[6]  But that is not all he did; to the contrary, Mr.

Harmening made clear that he also watched all of the available videos at full speed,

listened to the dispatch radio traffic, and reviewed the testimony of the witnesses

---

[5] Notably, Defendants do not argue for exclusion under the first or third prongs of
the three-part test.  Though not in dispute, it appears that these two prongs are
nevertheless satisfied, as Mr. Harmening is qualified to testify competently
regarding this police shooting and his testimony will undoubtedly assist the jury in
understanding the evidence or determining a fact in issue.

[6] The Court sees little practical difference between this "frame-by-frame" analysis
method and simply pausing the video at different points to review still shots.
Indeed, as part of its review, the Court did just that.

and responding officers, and his analysis and conclusions stemmed from these methods collectively.  He did not rely solely on the still frames, to the exclusion of all other evidence, in reaching his conclusions.[7]

Of course, the Court does not mean to suggest that all of Mr. Harmening's opinions and testimony can definitively be admitted at trial.  Indeed, the Court appreciates Defendants' concerns that Mr. Harmening's use and display of the frame-by-frame shots to a future jury might "not tell the full story" in light of how quickly the shooting occurred.  However, the parameters of Mr. Harmening's testimony at trial are a matter to be resolved later.  In particular, the parties are welcome to file and brief motions in limine regarding which aspects of his testimony can and cannot be used.  Certain elements of Mr. Harmening's frame-by-frame analysis may be presented in a way that would be admissible and avoid the issues recently identified by the Sixth Circuit in Cunningham v. Shelby County, Tennessee, 994 F.3d 761, 766-67 (6th Cir. 2021), and the Eleventh Circuit in Prosper v. Martin, 989 F.3d 1242 (11th Cir. 2021), and emphasized by Defendants here.

---

[7] Indeed, he stated that "[t]he still frames [he] provide[d] are used only to show at various times what is clearly seen on the body cam videos."  [Dkt. 78-1 – Harmening Aff., at ¶ 2].

Accordingly, Defendants Gainesville and Hernandez's Motion to Exclude Opinions of Plaintiffs' Expert [Dkt. 71] is **DENIED**.

## CONCLUSION

For the foregoing reasons, Defendant Officer Jonathan Fowler's Motion for Summary Judgment [Dkt. 67] is **DENIED**, and Defendants the City of Gainesville and Officer Jose Hernandez's Motion for Summary Judgment [Dkt. 68] is **GRANTED in part** and **DENIED in part**.  It is granted as to Plaintiffs' state law claims against the City and denied as to the remainder of Plaintiffs' claims against Defendant Hernandez.  The City of Gainesville is hereby dismissed as a Defendant in this case.

In addition, Defendant Gainesville and Hernandez's Motion to Exclude Opinions of Plaintiffs' Expert [Dkt. 71] is **DENIED**, and Defendant Fowler's Motion to Adopt Co-Defendants' Motion to Exclude [Dkt. 74] is **GRANTED**.

The remaining parties are directed to file a proposed consolidated pretrial order within 30 days of the entry of this Order.

**SO ORDERED** this 2nd day of March, 2022.

_____

**RICHARD W. STORY**
United States District Judge